IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEYBANK NATIONAL ASSOCIATION, ) ) Plaintiff, ) ) vs. ) ) VOYAGER GROUP, L.P. and VOYAGER ) INVESTMENTS LP, ) Defendants. ) ) ──────────────────────────────── ) ) SPANISH PEAKS LODGE, LLC, ) VOYAGER GROUP, L.P. and VOYAGER ) INVESTMENTS, L.P., ) Plaintiffs, ) ) vs. ) ) KEYBANK NATIONAL ASSOCIATION ) and KEYBANK CAPITAL MARKETS, ) INC., ) Defendants. ) ) ──────────────────────────────── ) ) SPANISH PEAKS HOLDINGS II, LLC, ) Successor to Spanish Peaks Holdings, LLC, ) ) Plaintiff, ) ) vs. ) ) KEYBANK NATIONAL ASSOCIATION ) and KEYBANC CAPITAL MARKETS, ) INC., ) Defendants. ) ) AMBROSE, Senior District Judge ) | Consolidated Case No. 10-0453 |

# OPINION AND
# ORDER OF THE COURT

## Synopsis

Defendants KeyBank National Association and KeyBanc Capital Markets, Inc. (collectively, "KeyBank"), move to dismiss the Complaint (Docket No. 65) filed by Spanish Peaks Holdings II, LLC ("SP Holdings") in this consolidated action. SP Holdings asserts claims for breach of contract, breach of the duty of good faith and fair dealing, promissory estoppel, fraudulent and/or negligent misrepresentation and constructive fraud arising from KeyBank's alleged failure to provide the necessary financing for a construction project located in Big Sky, Montana. KeyBank has moved to dismiss the Complaint on the grounds that SP Holdings lacks standing to assert claims for breach of contract or breach of the duty of good faith and fair dealing, the claim for promissory estoppel is barred by Montana statute, SP Holdings had no right to rely on any alleged misrepresentations and that KeyBank did not owe a legal duty to SP Holdings. For the reasons set forth below, I deny Defendants' motion to dismiss.

**I. Applicable Standard**

In deciding a motion to dismiss under Fed R. Civ. P. 12(b)(6), all factual allegations, and all reasonable inferences therefrom, must be accepted as true and viewed in a light most favorable to the plaintiff. Haspel v. State Farm Mut. Auto. Ins. Co., 2007 WL 2030272, at *1 (3d Cir. July 16, 2007). "[P]leading standards have. . .shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). After the Supreme Court's opinion in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), "it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss:

'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Fowler, 578 F.3d at 210 (quoting Iqbal, 129 S. Ct. at 1949).

> "[A]fter *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. . . .Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 210-211 (citing Iqbal, 129 S. Ct. at 1950). "As the Supreme Court instructed in *Iqbal,* '[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'"

Id. at 211 (quoting Iqbal, 129 S. Ct. at 1949).

## II. Factual Allegations

Plaintiff SP Holdings, a Delaware corporation with its principal place of business in Big Sky, Montana, is the successor-in-interest to Spanish Peaks Holdings, LLC. SP Holdings is the owner and developer of The Club at Spanish Peaks (the "Club"), located in Montana's Gallatin and Madison counties, which offers golf, skiing and other leisure activities for its residents who purchase real estate, homes and memberships. As the centerpiece of the Club, SP Holdings planned to construct "The Lodge at Spanish Peaks" (the "Lodge" or "Lodge Project"), a large, mixed-use building containing forty-nine personal residences and a wide range of amenities for the Club's members, including a restaurant, lounge, ski shop, spa and fitness center. In addition to serving as the Club's picturesque focal point, the Lodge was intended to (1) provide the Club's members with a host of benefits and amenities; (2) increase the desirability and market value of the home sites, condominiums and previously constructed residences throughout the Club, and (3) generate a substantial stream of revenue for SP Holdings from sales of homes, condominiums and home sites within the Club. SP Holdings believed that the completed and

3

operational Lodge was imperative to the ultimate viability and success of the Club as a whole, and extensively publicized the Lodge and its amenities to prospective members of the Club.

By the spring of 2007, SP Holdings had completed the infrastructure necessary to develop the Lodge Project and sold completed homes and cabins as well as numerous parcels of real estate for the construction of homes. In March 2007, SP Holdings created SP Lodge, a single purpose entity wholly owned by SP Holdings established for the explicit purpose of developing and constructing the Lodge Project. SP Holdings conveyed to SP Lodge the right to construct the Lodge on the Club's land, but retained its ownership of the land.

In May of 2007, SP Lodge entered into negotiations with KeyBank to provide the necessary financing. During the course of negotiations, KeyBank's representatives, including David Paisley, traveled with representatives of SP Holdings, SP Lodge and the Voyager Entities, including Messrs. Hein and Dolan, to the Spanish Peaks site to evaluate the Lodge Project. Mr. Paisley stated that KeyBank was interested in underwriting the $120 million credit facility necessary to construct the Lodge.

On June 21, 2007, KeyBank decided to proceed with the underwriting of the credit facility. It hired Intermountain Consultants, Inc. ("Intermountain") to appraise the Lodge Project, having rejected all appraisers recommended by SP Lodge. SP Lodge expressed its concern that Intermountain lacked experience with comparable projects and its doubt that Intermountain would be able to determine an accurate value for the Lodge Project. KeyBank ignored these clearly expressed concerns.

On July 31, 2007, KeyBank provided a written commitment to loan $120 million to SP Lodge for the development and construction of the Lodge Project. (A copy of the Loan Commitment is annexed to the Complaint as Exhibit A.) The Loan Commitment identifies as

"Borrower" "SP Lodge, LLC, the sole member of which will be Spanish Peaks Holdings, LLC." It was signed by Brad Paisley on behalf of KeyBank, and by Doug Hein, as assistant manager of SP Lodge. SP Holdings and the Voyager Entities agreed to guarantee the $120 million credit facility. The completion of an appraisal of the Lodge Project was a condition precedent to the closing of the loan. From July through October 2007, KeyBank assured representatives of SP Holdings, SP Lodge and the Voyager Entities that it had the intent and ability to obtain a timely appraisal of the Lodge Project and to satisfy other conditions in order to ensure a timely closing of the loan. All parties expected the credit facility to close on or before October 15, 2007. Indeed, on September 14, 2007, Mr. Paisley represented to the contractor hired to construct the Lodge Project that KeyBank had committed to finance the Lodge Project and was in the process of closing the loan.

In reliance on these repeated representations, SP Holdings contributed substantial funds towards the Lodge Project's construction. SP Holdings directed SP Lodge to enter into agreements with the construction contractor, which in turn contracted with various subcontractors and vendors to begin construction on the Lodge Project. SP Holdings itself also entered into various agreements, including the pre-sale agreements with purchasers of Lodge condominium units, and continued pre-existing contractual relationships with other parties, such as CTA, the Lodge Project's architect.

On September 17 and 18, 2007, SP Holdings, SP Lodge, the Voyager Entities and KeyBank met with representatives of various banks interested in joining a lending syndicate that KeyBank had formed to underwrite the $120 million credit facility. The purpose of the meeting was to permit the potential syndicate members to evaluate the overall Lodge Project. During that meeting, representatives of KeyBank made oral and written representations to SP Holdings and

5

the other entities that KeyBank had the intent and ability to obtain a timely appraisal of the Lodge Project, ensure the occurrence of conditions to closing and loan the funds necessary to complete the Lodge Project. KeyBank's representatives proposed a closing date of October 15, 2007. On or after this meeting, the lenders agreed to join the syndicate, pending the completion of KeyBank's appraisal. In reliance on KeyBank's representations, SP Holdings continued contributing funds towards the Lodge Project's construction.

In the meantime, KeyBank offered to make a $5million bridge loan to SP Lodge to enable it to begin construction immediately. KeyBank represented to SP Lodge that the credit facility would be available in short order and that the bridge loan could be repaid from the credit facility. Based on these representations, SP Lodge accepted the bridge loan and the Voyager Entities guaranteed the repayment of the bridge loan. The bridge loan was finalized on September 28, 2007 with a 90-day term and one 30-day extension. The limited term reflected the parties' belief that the $120 million credit facility would close promptly.

However, in October 2007, Intermountain Consultants, Inc., KeyBank's selected appraiser, abruptly resigned from the project, stating that it lacked the ability to properly appraise the Lodge Project. In its stead, KeyBank engaged Cushman & Wakefield, one of the firms originally suggested by SP Lodge, to appraise the Lodge Project. The new appraiser essentially had to start the appraisal process from the beginning, preventing the finalization of the syndicate and the timely closing of the $120 million credit facility. Between October 2007 and February 2008, when the appraisal was completed, economic conditions nationally and internationally had begun to deteriorate, negatively impacting the willingness and ability of lenders to loan significant monies for large real estate development projects like the Lodge Project.

Notwithstanding this delay, KeyBank continued to represent to SP Holdings, SP Lodge and the Voyager Entities that it would finance the Lodge Project. In reliance on this representation, SP Holdings, SP Lodge and the Voyager Entities refrained from terminating their relationship with KeyBank. In early February 2008, the parties held a conference call regarding the Lodge Project's appraisal value and its potential effect on KeyBank's total obligation pursuant to the July 31, 2007 Loan Commitment. At a subsequent meeting between representatives of the parties, KeyBank's representative stated that, based on the Cushman & Wakefield appraisal, the amount that KeyBank was obligated to loan to SP Lodge would be reduced in accordance with the loan-to-value formula set forth in the Loan Commitment. At no point during these conversations did Key Bank suggest that it was not bound by the terms of the Loan Commitment. SP Lodge obtained additional equity and alternative funding necessary to close the financing gap created by the appraisal.

Throughout the spring of 2008, KeyBank continued to represent, both to SP Lodge, SP Holdings, and third parties, that it could complete the credit facility for the construction of the Lodge Project despite the deepening credit crisis and KeyBank's own financial difficulties. KeyBank repeatedly extended the term of the $5 million bridge loan. In August, KeyBank informed the parties that it could no longer honor the 75% loan-to-value ratio. The parties agreed to a lower loan-to-value ratio and SP Lodge sought additional financing from other lenders. Nevertheless, based on KeyBank's continued assurances, SP Lodge continued with the construction of the Lodge Project and SP Holdings and the Voyager Entities continued to contribute additional funds towards its construction.

Ultimately, KeyBank failed to keep its promise of providing a substantial credit facility for the Lodge Project. As a result, SP Lodge was unable to repay the $5 million bridge loan or

7

continue construction of the Lodge Project. The Voyager Entities could not discharge their obligations under the guarantees. In the distressed state of the credit markets, SP Holdings, SP Lodge and the Voyager Entities have been unable to obtain alternative financing. Because construction of the Lodge has stopped, SP Lodge has been unable to complete the sales of residences and commercial space within the Lodge. SP Holdings' inability to complete the Lodge Project or provide the Lodge's benefits to Club members has negatively impacted real estate sales and depressed real estate values within the Club.

SP Holdings assert five claims against KeyBank. Count I alleges that SP Holding was an intended beneficiary of the Loan Commitment and asserts a claim for breach of contract stemming from KeyBank's failure to engage a qualified appraiser, its revision of the terms of the Loan Commitment and its failure to close on the credit facility. Count II alleges that KeyBank breached its duty of good faith and fair dealing through its selection of an unqualified appraiser, its repeated assurances that it would provide the financing for the Lodge Project in accordance with the Loan Commitment and its failure to close on the credit facility. In Count III, SP Holdings alleges that it detrimentally relied on those promises. Similarly, in Counts IV and V, SP Holdings alleges claims of fraudulent and/or negligent misrepresentation and constructive fraud premised on KeyBank's assurance.

### III. Defendants' Motion to Dismiss

#### A. Breach of Contract (Count I)

KeyBank has moved to dismiss Count I of the Complaint on the grounds that SP Holdings is not a third party beneficiary of the Loan Commitment, and therefore lacks standing to assert a claim for breach of contract. Both parties agree that Montana law applies and that Montana follows the Restatement (Second) of Contracts § 302 with respect to third party

8

beneficiaries. Dick Anderson Constr. Inc. v. Monroe Constr. Co, LLC, 221 P.3d 675, 685 (Mont. 2009). Under section 302, a party is an intended beneficiary of a contract "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary; or (b) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance." Harman v. MIA Serv. Contracts, 858 Pa. 19, 22-23 (Mont. 1993).

Key Bank relies principally on Solutia Inc. v. FMC Corp., 385 F. Supp.2d 324 (S.D.N.Y. 2005) to support its argument that SP Holdings has not alleged third party beneficiary status. In Solutia, the contract at issue identified the plaintiff as an intended third party beneficiary. However, the plaintiff only had a 50% ownership interest in Astaris (the promisee) and the court found that there was "no indication that FMC [the promisor] would deliver any performance directly to Solutia, or that Astaris would transfer the benefit of any performance it received to Solutia." Id. at 338. Under these circumstances, the court held that the plaintiff was only an incidental beneficiary to the contract, and lacked standing to assert a claim for breach of contract against FMC. Id.

I find that the facts in Solutia are distinguishable from the allegations herein. SP Holdings has alleged that it is the sole owner of SP Lodge, a single purpose entity established for the explicit purpose of developing and constructing the Lodge Project. While not entirely clear from the allegations of the Complaint, it appears that many of the same individuals who represent SP Holdings also represent SP Lodge. While the Loan Commitment does not contain a third party beneficiary clause, it does expressly recognize the relationship between SP Holdings and SP Lodge: the "Borrower" is identified as "SP Lodge, LLC, the sole member of which will

9

be Spanish Peaks Holding, LLC." (Docket No. 1-2, at 4.) The allegations of the Complaint also make clear that KeyBank was aware of the role of and the importance of the Lodge Project to the Club as a whole. While SP Holdings is identified also as a guarantor of the Loan Commitment, KeyBank has cited no case law holding that guarantor status precludes a party from also being the third party beneficiary of the contract. Accordingly, given these allegations, I find that SP Holdings has pleaded sufficient facts which, if true, would confer third party beneficiary status on SP Holdings.

### B. Good Faith and Fair Dealing (Count II)

Defendants move to dismiss Count II of the Complaint on the grounds that, since SP Holdings is neither a party to the Loan Commitment nor a third party beneficiary, it lacks standing to assert such a claim. (Docket No. 61, at 12.) Because I have held that SP Holdings has adequately alleged third party beneficiary status, I will deny KeyBank's motion to dismiss Count II for the same reasons.[1]

### C. Promissory Estoppel (Count III)

Defendants argue that SP Holdings claim for promissory estoppel is barred by Montana Code §31-1-116. The statute provides that: "(1) With respect to a commercial loan, a contract action or a breach of contract action may not be brought against a regulated lender on a promise or commitment that is not in writing where the promise or commitment is to: (a) lend money or to extend credit; (b) alter, amend, renew, extend, or otherwise modify an existing promise, commitment, or agreement to lend money or to extend credit: or (c) make a financial accommodation." SP Holdings responds that section 31-1-116 only applies to claims for breach of contract, not for promissory estoppel.

---

[1] Defendants also argue that SP Holdings has not pleaded a tort claim for breach of the duty of good faith and fair dealing. Since SP Holdings denies that it has asserted a tort claim in Count II of the Complaint, I need not address this argument.

The parties have not supplied me with any case law interpreting section 31-1-116, nor have I found any such case law myself. Given the lack of guidance from Montana courts on how to interpret the statute, I am constrained to apply the statute exactly as written. By its express terms, the statute applies only to contract actions or breach of contract actions, not equitable claims. In Austin v. Cash, 906 P.2d 669, 674 (Mont. 1995), relied upon by Defendants, Montana's Supreme Court explained that "where a case is clearly within the statute of frauds, promissory estoppel is inapplicable, for the net effect would be to repeal the statute completely." While I find this reasoning persuasive, the language of the statute before me is narrower than the language of statute applied by the court in Austin, which declared "invalid" certain "agreements" unless made in writing and subscribed by the party to be charged. 906 P.2d at 673 (quoting MCA 28-2-903). By contrast, section 31-1-116 only prohibits specific kinds of actions where the agreement is not in writing, it does not render such agreements invalid. Accordingly, I find that SP Holding's claim for promissory estoppel is not barred by Montana statute.

Defendants also argue that any alleged promises would have been made solely to SP Lodge, which was the sole borrower identified in the Loan Commitment. Under Montana law, the elements that are required to state a claim for promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) reasonableness and foreseeability of the reliance; and (4) the party asserting the reliance must be injured by the reliance. Keil v. Glacier Park, Inc., 614 P.2d 502, 506 (Mont. 1980). SP Holdings has alleged that KeyBank made promises to SP Holdings, including that KeyBank would engage an appraiser with the ability to appraise the Lodge in a competent and timely manner; that KeyBank would close on the credit facility on or before October 15, 2007; and that even after failing to close in October 2007, it continued to have the intent and ability to

close on a credit facility sufficient to complete construction of the Lodge Project. SP Holdings further alleges that, in reliance on these promises, it contributed funds and entered into agreements for the furtherance of the Lodge Project. These allegations are sufficient to state a claim for promissory estoppel under Montana law.[2]

Accordingly, Defendants' motion to dismiss is denied with respect to Count III of the Complaint.

### D. Fraudulent and/or Negligent Misrepresentation (Count IV)

Defendants move to dismiss SP Holdings claim for fraudulent and/or negligent misrepresentation on the grounds that, as a matter of law, SP Holdings had, respectively, no right to rely on any alleged misrepresentations and could not have justifiably relied on the representations. The sole case relied upon by Defendants to support their position is <u>Avco Fin. Svcs. v. Foreman-Donovan</u>, 772 P.2d 862 (Mont. 1989), which they claim requires a showing that the parties were not on equal footing. Under Montana law, the issue of reliance is a factual question more appropriately raised on a motion for summary judgment or at trial. <u>See</u> <u>Zugg v. Ramage</u>, 779 P.2d 913, 916 (Mont. 1989) ("question of plaintiffs' right to rely on the representations. . .is, we believe, peculiarly in the province of a jury"); <u>Avco Fin. Svcs.</u>, 772 P.2d at 864 (granting summary judgment where, after examining the evidence, plaintiff had not presented a prima facie case on the issue of whether she had a right to rely on the representations).

Similarly, Defendants' argument that SP Holdings was not a party to the Loan Commitment and thus has no right to rely on any representations made in connection with the Loan Commitment is also premature. As discussed in section A above, SP Holdings has alleged

---

[2] In my prior opinion, dated February 4, 2101, in <u>KeyBank Nat'l Ass'n v. Voyager Group, L.P.</u>, previously 09-CV-1238, now consolidated herewith, I held that the Voyager Entities had adequately pleaded a claim for promissory estoppel based on similar allegations.

12

that it is a third party beneficiary of the Loan Commitment, and I have denied Defendants' motion to dismiss this claim. The allegations and the arguments of the parties reveal that many individuals may have been wearing numerous hats during the course of the negotiations at issue. The details of these relationships must be sorted out during discovery. At this stage of the proceedings, I am bound to accept Plaintiff's factual allegations as true. Accordingly, I deny Defendants' motion to dismiss Count IV of the Complaint.

### E. Constructive Fraud (Count V)

Defendants move to dismiss Plaintiff's claim for constructive fraud on the grounds that Plaintiff "does not identify the specific duty owed by KeyBank to SP Holdings for such a claim to proceed." (Def. Br. at 20.) As I previously held in my opinion in KeyBank Nat'l Ass'n v. Voyager Group, LP, 09-CV-1238, "[t]he presence of a legal duty is an essential element of a claim for constructive fraud but does not require that the Plaintiff establish a fiduciary relationship." (Docket No. 36, at 13.) "Duties sufficient to give rise to a claim for constructive fraud may arise in commercial transactions." Id. (citing Mattingly v. First Bank of Lincoln, 947 P.2d 66, 72 (1997)). "[W]here a party, by his words or conduct creates a false impression concerning serious impairments or other important matters and subsequently fails to disclose relevant facts, constructive fraud may be found." Mattingly, 947 P.2d at 72.

Here, Plaintiff has alleged that it is a third party beneficiary of the Loan Commitment. Plaintiff has further alleged that KeyBank made material misrepresentations regarding the ability of its appraiser to conduct the appraisal, the timing of the closing of the loan, and its continued ability and willingness to close on the loan. I find that these allegations adequately plead a claim for constructive fraud. Accordingly, Defendants' motion to dismiss Count V is denied.

## Conclusion

Based on the foregoing, Defendants' motion to dismiss is DENIED in all respects.

## ORDER OF COURT

Having carefully considered Defendants' motion to dismiss the Complaint [Docket Nos. 60, 61] and Plaintiff's opposition thereto [Docket No. 62], it is hereby ORDERED that Defendants' motion to dismiss is DENIED.

Dated: December 28, 2010

                                     BY THE COURT:

                     /s/ <u>Donetta W. Ambrose</u>
                         Donetta W. Ambrose,
                         Senior U.S. District Judge